ESIDA YASSIN, a Minor, by her Mother and Next Friend, Sofia Yassin, *et al.*, Plaintiffs-Appellants, v. CERTIFIED GROCERS OF ILLINOIS, INC., *et al.*, Defendants-Appellees.

First District (2nd Division) No. 84—0032

Opinion filed December 9, 1986.

Milton M. Blumenthal & Associates, of Chicago (Milton M. Blumenthal and Sidney Z. Karasik, of counsel), for appellants.

Crooks & Gilligan, Ltd., of Chicago (John W. Gilligan and Joseph R. Steiger, of counsel), for appellee Mizyed-Yassin Corporation.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, Donald J. O'Meara, and Joshua G. Vincent, of counsel), for appellee Hobart Corporation.

Lord, Bissell & Brook, of Chicago (William J. White, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee Certified Grocers of Illinois.

Bell, Boyd & Lloyd, of Chicago (Francis J. Higgins and John Versca, of counsel), for appellee Underwriters Laboratories, Inc.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff,[1] a three-year-old child, was severely injured when she placed her left hand in an operating commercial meat tenderizer. She later filed the present suit against Mizyed-Yassin Corporation, which owned the grocery store where the accident took place; Certified Grocers, Inc. (Certified), a cooperative with which the grocery store was affiliated; Hobart Corporation, the company that manufactured the meat tenderizer; and Underwriters Laboratories (U.L.), an independent testing laboratory, which tested a model of the meat tenderizer that caused her injury. The case went to the jury on a negligence count against Underwriters Laboratories and a strict liability count against Hobart Corporation. The trial judge directed verdicts in favor of defendant Certified Grocers on a negligence charge and defendant U.L. on a strict liability count. The jury returned a special verdict to the effect that the meat tenderizer was not unreasonably dangerous and found Hobart and U.L. not guilty. However, the jury did return a verdict of negligence against Mizyed-Yassin Corporation, awarding plaintiff $300,000 in compensatory damages. Plaintiff now appeals, asserting that she was denied a fair trial. We affirm.

Defendant Mizyed-Yassin Corporation was jointly owned by plaintiff's father, Khalil Manna Yassin, and her uncle, Abdelhamed Mizyed. The corporation purchased the Certified Food Center in Burbank, Illinois, and began operating it in September 1975. Defendant Hobart Corporation manufactures and distributes food-preparation equipment, including the Steakmaster Model 401 meat tenderizer that caused the injury in this case. U.L. is a corporation whose announced purpose is to test products for public safety. Certified Grocers of Illinois advertises, packages, and sells food products, and operates as a cooperative of grocery stores that included the store at which the accident underlying this lawsuit took place.

Plaintiff's mother testified that she went to her husband's store with plaintiff at 7:45 p.m. on April 8, 1976. When they entered, she took plaintiff by the hand and began shopping. She dropped plaintiff's hand to reach for some cookies, and before she finished reading the ingredients, she heard a scream. Plaintiff's mother went to the source of the scream and saw plaintiff on the floor with her left hand in the meat tenderizer. Mizyed unplugged the machine and called the fire department, which took plaintiff to Christ Community Hospital, where

---

[1]There are two named plaintiffs in this case, Esida (Sadie) Yassin, and her mother, Sofia Yassin. However, to be consistent with the briefs we will refer to Esida as plaintiff and to her mother by name.

she remained for 10 days.

Adjacent to the meat counter at the rear of the store was a doorway with doors broken or propped open. Beyond the doorway was a 32-inch-high work table with the model 401 meat tenderizer on top and next to it an 18-inch table and several wooden soda-pop bottle cases arranged in "stepping stone" fashion. Mizyed testified that on the night of the accident, he was tenderizing meat there with the cover of the 401 raised so that he could work faster. He left the machine running unattended while he went back to the cooler to get more meat, then he heard screams.

Plaintiff's orthopedic surgeon testified that plaintiff's tendons, bones, skin, and nerves were cut beyond repair and that he was forced to amputate her left hand just above the wrist. The surgeon testified that plaintiff suffered pain due to the "phantom limb" phenomenon and that the muscles in her forearm have decreased, leaving her left arm permanently smaller.

Dr. Blair, another treating surgeon, testified that loss of a left hand up to and including the wrist impairs the entire left extremity by 90% and impairs total body function 30 to 40%. He stated that with emotional impairment resulting from the accident, plaintiff suffers a 50% total impairment. When Dr. Blair saw plaintiff in September 1983, the month in which the trial began, she suffered repeated nightmares, wet her bed, and experienced difficulty in feeding herself and in making friends, all because of the loss of her hand. He stated that plaintiff's phantom limb syndrome was permanent.

Dr. Geist, a rehabilitation psychologist, testified that plaintiff violently strikes out with the injured limb, has vomiting episodes, and is not a happy child, often withdrawing into herself. However, plaintiff could describe the accident matter-of-factly, and Dr. Geist stated that plaintiff was attending school daily and had been able to shift function to her right hand. Plaintiff liked her brothers and sisters, played soccer, jumped rope, could eat with her one hand, was neat, polite, and cooperative, and spoke some English, Italian, Spanish, and Arabic. Nonetheless, according to Dr. Geist, the accident was a severe blow to plaintiff's self-image and she will require psychotherapy for an indefinite period as a result. Dr. Geist testified that although plaintiff expressed an interest in becoming a teacher, she had neither the psychological nor intellectual capacity for it. Afterwards, the doctor discovered that she had made an error in estimating plaintiff's I.Q., and she revised the calculation, finding it to be within the normal range. However, the psychologist stated that plaintiff's employability was "still not very good."

Dr. Arthur Dobbleaere, an associate professor of Industrial Relations at Loyola University, estimated the present value of plaintiff's total loss of future salary and benefits to be $746,041.

Plaintiff's safety expert, Ralph Newman, described the Hobart 401 tenderizer as having an easily removable cover and two rollers with 41 knife discs. Each knife disc has 12 protruding edges. In one second approximately 2,000 knife edges cross a one-eighth-inch plane. The 401 operates whether the cover is open or closed. A companion model manufactured by Hobart, the 401—S, has a cover interlock that stops the rollers when the cover is raised. However, by moving a magnet, this safety interlock is commonly defeated in practice, according to Newman, so that the companion model can also be generated with the cover raised. He indicated that operators generally raise the covers to increase production, but that a double interlock device would prevent this.

The 401—S is also equipped with an extension chute to be placed over the opening into which meat is fed. The specification sheets for the 401—S state that this chute keeps hands a safe distance from the tenderizing knives. The opening in the cover of the 401 is 1⅝ inches wide, while most steaks are between ¾ and 1¼ inches thick. Cuts of meat thicker than 1½ inches are tenderized by raising the machine's cover and dangling the meat above the rollers until it is drawn into the blades. The opening on the extension chute of the 401—S is 1¼ inches. Newman testified that, in his opinion, the cover interlock switch in the 401—S did not impair its function because the machine is designed to take even thick cube steaks and that lengthening the extension chute of the 401—S by 6 inches would not compromise its usefulness.

Both the 401 and the 401—S were designed in 1956 and marketed in 1957. New York permitted only sale of the 401—S in that State because of the safety extension chute and the cover interlock switch. Hobart continued to manufacture the 401 until 1970. The successor model to the 401, the 403, was first manufactured in that year. The 403 has an extension chute and an interlock that cannot be mechanically defeated.

The particular machine involved in this case had been sold to the Hillman's Grocery store in Chicago in April 1961. Defendant Certified Grocers later purchased it, and the machine eventually found its way to the store that plaintiff's father and uncle subsequently purchased. The on-off toggle switch of the machine in question had been broken into the "on" position so that it could be stopped only by unplugging it. Mizyed testified that this tenderizer was not used by the store's

union butchers but that he personally operated it two to four times per week.

Newman testified that he had retrofitted 200 to 300 food processing machines with safety devices. In the case of meat tenderizers, this generally involved installing a switch to prevent the machine from operating with the cover raised and occasionally adding an extension chute. Newman visited 2,500 stores per year and saw that tenderizing machines lacking such a safety system were customarily operated with the cover raised and roller exposed. Newman testified that the 401 is generally used at the end of a counter in the meat-processing area in open view of customers. Newman concluded that the Hobart model in question was unreasonably dangerous when it left the factory in 1961 because it did not have a safety switch to shut off the machine when the cover was raised, or an extension chute, and because it lacked a "kick-out" device to quickly dislodge a hand caught on a roller. He was also concerned that the toggle switch was easily broken off and the transparent cover discolored with age, inducing operators to raise it to see the meat.

Another witness for plaintiff, Daniel Goduto, had been an officer or representative of a butcher's union for almost 30 years. He testified that he was familiar with and had operated the 401 and 401—S and that he visited approximately 2,500 supermarkets per year. He noted that the 401 is generally operated with the cover raised or removed, while the 401—S is generally operated with the cover down. He witnessed three accidents in the 1950's involving the 401, or its predecessor, the 400, but had never witnessed any with the 401—S or the 400—S. Goduto testified that butchers frequently hit the on-off switches with meat trays, often breaking them. He admitted that butchers sometimes ignored instructions to operate the 401 only with the cover down, but he denied that they bypassed the interlock in the 401—S because they would be fired on the spot for doing so.

Dr. William Bliss, an engineering psychologist and "human factors" consultant (although not an engineer), also testified for plaintiff. Bliss never tenderized meat in the machine, but he tested it by running paper through and taking measurements. He concluded that it was efficient to operate the 401 with the cover raised and unattended for short periods of time and stated that it was reasonably forseeable to the manufacturer that the machine would be placed where the public had unobstructed access. He testified that in his opinion it was not necessary for the cutting blades to be exposed for the machine to perform efficiently. Bliss concluded that the 401 was unreasonably dangerous because it had no fixed guard to protect the moving blades

and because, even with the cover down, the slot is too large and there is no extension chute to protect the hand. He acknowledged, however, that the presence or absence of an extension chute would have made no difference in this particular accident because the machine was operated with its cover raised.

Richard Swob, president of the commercial equipment division of Hobart, was called as a witness by plaintiff. He admitted that if the 401 became jammed, it was forseeable that the operator would fail to put the cover down after unjamming the machine. He stated that there was nothing in the 401 to keep human hands off of the knives while rotating but that the handles on top of the lift-out unit prevent accidental contact from the top. Swob also acknowledged that it was very difficult to sell a product without U.L. approval.

Robert Seelbach, vice-president and chief electrical engineer for U.L., testified that when the cover is raised on the 401 there is no effective guard over the exposed rollers. Seelbach indicated that U.L. will list products as approved only if it has a follow-up agreement with the manufacturer. He noted that there are no markings or warnings on the 401 and that U.L. never recommended that Hobart include instructions that the 401 be used solely by professionals. Seelbach testified that the blades of the 401 must be exposed to the extent that they are capable of receiving meat.

Glen Stockmeir, director of Hobart's product design policy, testified that U.L. had examined and approved the 401 in each of the 14 years that it was manufactured. He stated that Hobart had considered the safety of operators in its design but not the safety of the general public. According to Stockmeir, Hobart could not have reasonably foreseen that someone would operate the tenderizer unattended with the cover off in an area accessible to children. Stockmeir agreed that the efficiency of the 401–S could be increased by defeating the interlock and operating the machine without a cover and added that Hobart's model 403 cover interlock could not be defeated.

Robert Horvath, an electrical engineer and the executive staff engineer for U.L., testified that in his opinion, the 401 complied with the applicable provisions of the U.L. standard for motorized appliances, standard 73. He stated that he did not know of any tenderizer that had an opening that would admit meat but also exclude the hand of a three-year-old child. He stated that because the 401 is a commercial device, one would not expect it to be used in an area accessible to the general public, and that the guarding was adequate for its intended use. He indicated that the 401–S is not any safer than the 401 because the magnetic interlock is easily defeated, as would be a

mechanical interlock. He agreed that it was reasonably foreseeable that a butcher would break the on-off switch by hitting it with a meat tray.

Ralph Barnett, a professor of mechanical and aerospace engineering at the Illinois Institute of Technology, testified for Hobart. Barnett testified that the 1⅝-inch opening on the 401 would admit most meats and most adult male hands. According to Barnett, the extension chute on the 401—S permits fewer people to reach the point of operation but the 401—S compromises the meat-knitting abilities of the tenderizer. Based on anthropomorphic data, Barnett testified that the wrists of most three- to four-year-old children who are 32 inches tall, as was plaintiff at the time of the accident, average .82 inches. Therefore, he concluded, small children could reach through the extension chute and touch the blades of the tenderizer. An interlock on the safety cover would not have affected this conclusion. Barnett testified that it is impossible to design a slot opening that will exclude all three-year-old children yet permit full function of the meat tenderizer, and that such design capability simply does not exist.

OPINION

■ Plaintiff's brief is divided into 31 separately headed assignments of error. A number of claimed errors concern evidentiary rulings. It is axiomatic that a party is not entitled to reversal based on rulings on evidence unless the error was substantially prejudicial and affected the outcome of the trial. (*Holsapple v. Country Mutual Insurance Co.* (1983), 112 Ill. App. 3d 512, 518, 445 N.E.2d 909, 912; *Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 1019, 388 N.E.2d 770, 777; *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 947-48, 953, 364 N.E.2d 533, 538, 542.) However, plaintiff has failed to demonstrate prejudice.

First, plaintiff objects to the exclusion or failure to compel the production of evidence that simply would have been cumulative of other evidence or testimony presented at trial. For example, plaintiff argues that the trial court improperly refused to allow her to introduce a patent for a safety device owned by Hobart and the patent application. The application states that the device "absolutely prevents the possibility of *** getting the fingers of the operator in a position to be seized and mangled by the rotating knives *** and *** it prevents the use of the machine for the purpose intended when the cover is swung open." Plaintiff argues that the patent was relevant to show the feasibility of safety devices and that Hobart knew of the risk of injury and could foresee that the tenderizer would be operated with

the cover lifted. However, plaintiff's counsel asked one of her expert witnesses, Newman, if there was any way that the 401 could be designed to prevent defeat of the safety interlock, and he responded:

"A. I am aware of a patent that Hobart has rights to which has a mechanical safety device, whereby if the cover is opened, a shield goes across the danger zone preventing the operator or bystander from being drawn into the machine, making the machine safe."

Thus, evidence of the patent was presented to the jury. Plaintiff does not indicate how her case would have been significantly furthered by introduction of the patent itself or the patent application.

■ Similarly, plaintiff sought to compel the appearance of three U.L. officials. The trial judge required her to choose one, and she called Robert Seelbach, U.L. vice-president and chief electrical engineer. Plaintiff now argues that she should have been allowed to call David Hoffman, U.L.'s vice-president of standards, to testify to U.L.'s standards, and David Breting, U.L.'s vice-president of follow-up services. However, evidence was introduced of U.L.'s standard applicable to the 401 and of U.L.'s follow-up services. Plaintiff does not indicate how the evidence that the two would have presented was other than cumulative. (See *Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 685, 455 N.E.2d 232, 238 (admission of cumulative evidence is within the discretion of the trial judge); *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 925, 419 N.E.2d 578, 589.) As it was, the transcript of proceedings runs over 3,000 pages. Moreover, the decision to compel the appearance of a party litigant under Rule 237(b) (103 Ill. 2d R. 237(b)) is committed to the discretion of the trial court. (*Oakview New Lennox School District No. 122 v. Ford Motor Co.* (1978), 61 Ill. App. 3d 194, 199, 378 N.E.2d 544, 548; *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 948, 364 N.E.2d 533, 538.) Plaintiff has not shown that the judge abused his discretion.

In addition, plaintiff argues that the trial judge improperly limited her examination of Seelbach, the U.L. official that she was allowed to call, concerning the tests used to evaluate the 401. However, Seelbach had filed an affidavit that he had no personal knowledge of the testing of the 401 or the development of the applicable standard. U.L.'s expert witness was Robert Horvath, and plaintiff extensively cross-examined him concerning U.L.'s testing of the 401. Plaintiff was allowed to examine Seelbach concerning U.L.'s contracts, objectives, activities, and general engineering principles, and he was on the stand for 1½ days. Plaintiff's argument is without merit.

Similarly, plaintiff argues that the trial court erred in refusing to

qualify her witness, Dan Goduto, as an expert. Goduto had 30 years' experience in a butcher's union and had visited the meat-preparation areas in thousands of grocery stores. Were we to find that Goduto should have been allowed to testify as an expert, based on his extensive experience (see generally E. Cleary & M. Graham, Illinois Evidence sec. 702.2 (4th ed. 1984)) plaintiff's claim of error would still fail because she has not shown prejudice.

■■ Plaintiff made an offer of proof that it was Goduto's opinion that the 401 was unreasonably dangerous because it did not have an interlock switch and that it was reasonably foreseeable that the 401 would be left unattended with the cover raised while children were in the vicinity. Goduto's opinion was based on personal visits to stores, the majority of which use the 401 at the end of the meat counter in open view with unobstructed public access. Nevertheless, plaintiff presented testimony from two other witnesses who were qualified as experts, William Bliss and Ralph Newman, who testified that the 401 was unreasonably dangerous for the same reasons suggested in Goduto's offer of proof. (See *North Maine Fire Protection District v. Village of Niles* (1977), 53 Ill. App. 3d 389, 392-93, 368 N.E.2d 516, 518-19.) Plaintiff has not shown prejudicial error in this case from her failure to obtain a numerical advantage of expert witnesses reiterating each others' opinions. (See *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 252, 302 N.E.2d 257, 264; *Geohegan v. Union Elevated R.R. Co.* (1915), 266 Ill. 482, 488, 107 N.E. 786, 790.) A trial judge's discretion in limiting the number of expert witnesses will be reversed upon a showing of abuse. (*In re Estate of Porter* (1963), 43 Ill. App. 2d 416, 422-23, 193 N.E.2d 617, 621. See also *Iverson v. Iverson* (1977), 56 Ill. App. 3d 297, 304, 370 N.E.2d 1135, 1141.) We find no abuse of discretion here.

■ Ralph Barnett, an expert witness for Hobart, testified that an extension chute, like the one found on the 401—S, would not prevent children reaching in and touching the blades of a meat tenderizer. According to Barnett, the average size of a three-year-old ·child's wrist is .82 inches, while the opening on a 401—S is 1⅝ inches. He concluded that it would be impossible to design a slot opening that will exclude all three-year-old children yet allow a meat tenderizer to fully function. To rebut this testimony, plaintiff now argues that the court erred in refusing to allow three-year-old children to demonstrate in court that they could not touch the blades of a 401—S. The judge also refused to permit mothers to testify that in an experiment their three-year-old children were able to reach the rollers of the 401, but not of the 401—S, when they extended their hands into the extension

chute as far as possible. Decisions as to the admission of courtroom demonstrations is within the discretion of the trial court (*People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 1022, 356 N.E.2d 891, 897-98), and it is proper to exclude inflammatory demonstrations designed for emotional appeal (*Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 77, 134 N.E.2d 526, 531). Moreover, whether the hands of three-year-old children would have been excluded by the tenderizer opening is of questionable relevance in light of the supreme court's decision in *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 13, 310 N.E.2d 1. The question whether the product was unreasonably dangerous must be answered with respect to those persons whose endangerment it is *"objectively reasonable* to expect." (Emphasis in original.) (57 Ill. 2d 7, 12, 310 N.E.2d 1, 5.) The meat tenderizer in this case was intended for commercial, not home, use, and we conclude that it was not error to exclude the demonstrative evidence respecting small children.

■■ Plaintiff also argues that the court erred in overruling her objection to Barnett's testimony that the probability of plaintiff's accident would be one in a billion. Barnett testified that one cannot statistically forecast the likelihood of a three-year-old child coming into contact with a meat tenderizer, but he postulated a theorem assigning probabilities to a sequence of events. The random factors he included were the probabilities (1) that an infant would wander away from its mother, (2) that the doors to the rear area of a store would be left open, (3) that boxes would be available for children to climb, (4) that a child would climb onto the boxes, (5) that a broken switch on a meat tenderizer would not be repaired, and (6) that a meat tenderizer would be left running and unattended. He concluded that the likelihood of this "bizarre string of circumstances" converging was on the order of one in a billion and added that regardless of the probabilities assigned to each event, the occurrence of this case was not predictable by engineers.

The problem with Barnett's analysis is that foreseeability, as applied under the doctrine of strict liability as well as negligence, does not require that the particular circumstances of a given accident be forseen; it is only necessary that the occurrence be of a type that is objectively reasonable to expect. (See *Blue v. St. Clair Country Club* (1955), 7 Ill. 2d 359, 364, 131 N.E.2d 31, 34; *Testa v. Kaluzny Brothers, Inc.* (1974), 23 Ill. App. 3d 841, 846-47, 320 N.E.2d 114, 118-19.) Thus, the statistical evidence of the likelihood of the particular accident in this case was irrelevant to the question whether the tenderizer was unreasonably dangerous. Furthermore, no studies were presented of the number of grocery stores with doors broken, or with

boxes available to be climbed, thus, Barnett's assignment of probabilities of these events was completely arbitrary. An expert's conclusions cannot be based on pure conjecture or speculation. (*Dyback v. Weber* (1985), 134 Ill. App. 3d 426, 442, 480 N.E.2d 845, 855; *Nelson v. Speed Fastener, Inc.* (1981), 101 Ill. App. 3d 539, 543, 428 N.E.2d 495, 498-99.) Finally, Barnett reached his conclusion by multiplying the probabilities he assigned to each individual event. However, for this so-called "product rule" to be utilized, the predicted events must be independent. (See *People v. Harbold* (1984), 124 Ill. App. 3d 363, 381-83, 464 N.E.2d 734, 748-50.) Clearly that was not the case here because the likelihood that a child would climb on boxes depends directly on whether those boxes were available and it is more likely that a meat tenderizer will be left running unattended if it has a broken switch.

■ Although it was error to permit Barnett's statistical testimony, we conclude that it is not a basis for reversal. The instructions and arguments made clear that liability did not depend on whether defendants could have predicted that the injury would happen to plaintiff the way that it did. Plaintiff was given an opportunity to present expert testimony to rebut Barnett's statistical conclusions, but she declined. "[T]he objective of a reviewing court is not to determine whether the record is totally free of error but whether any error occurred which substantially prejudiced plaintiff and affected the outcome below." (*Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 1019, 388 N.E.2d 770, 777. See also *Kincl v. Hycel, Inc.* (1977), 56 Ill. App. 3d 772, 792, 372 N.E.2d 385, 399-400.) We conclude that in the context of the entire trial, the statistical testimony of Barnett was not substantially prejudicial.

■ Plaintiff next argues that the court erred in refusing to give her instructions numbers 19 and 22, which explain that she contended that the Hobart model 401 was unreasonably dangerous because it failed to include warnings not to leave the machine running and unattended. Plaintiff acknowledges that there is no duty to warn of open and obvious dangers (see *Soto v. E. W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 886-87, 452 N.E.2d 572, 577; *Weiss v. Rockwell Manufacturing Co.* (1973), 9 Ill. App. 3d 906, 912-13, 293 N.E.2d 375, 379-80), but argues that whether the danger of an operating meat tenderizer is open and obvious is a question of fact for the jury. However, plaintiff's own expert testified that, with the safety cover raised, the rotating blades are loud and visible and that the danger is obvious. Plaintiff points to no evidence in the record that would support any other conclusion. There

must be some evidence on a point before an instruction thereon will be given. (*In re Estate of Loesch* (1985), 134 Ill. App. 3d 766, 771-72, 481 N.E.2d 32, 36.) Consequently we find no error in the omission of the duty-to-warn instruction. The jury was instructed that plaintiff's theory of the case was that the 401 was unreasonably dangerous because it lacked an extension chute and a cover interlock switch and that this design allowed it "to be used while the blades of the rollers were exposed and rotating."

■ Plaintiff next argues that the trial court erred in refusing to allow Hobart's director of product design, Glen Stockmeir, to testify to his knowledge of the existence of absence of similar accidents with the model 400—S and the model 401—S, both equipped with safety devices that the 401 lacked, and manufactured simultaneously with the 401. Such evidence is admissible to show the feasibility of alternative designs (*Smith v. Verson Allsteel Press Co.* (1979), 74 Ill. App. 3d 818, 828-29, 393 N.E.2d 598, 606; *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 282 N.E.2d 749), defendant's knowledge of a safe design (*Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 251, 466 N.E.2d 1191, 1196), and many other purposes other than as an admission of negligence. (See generally E. Cleary & M. Graham, Illinois Evidence sec. 407.1 (4th ed. 1984).) Evidence of the number of accidents with the S-series would show the efficacy of the safety measures that plaintiff sought, a fact that is certainly relevant to this litigation. (See *Darrough v. White Motor Co.* (1979), 74 Ill. App. 3d 560, 564-65, 393 N.E.2d 122, 125-26; *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 511, 373 N.E.2d 1354, 1367.) However, the judge refused the evidence because plaintiff was not injured on a model of the S-series and she could not show that the accidents with the other models occurred under circumstances that were similar to hers.

The question whether an occurrence is sufficiently similar to the one at issue is generally left to the sound discretion of the trial judge. (*Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 672, 475 N.E.2d 1383, 1387.) It need not be shown that other accidents occurred in an identical manner; substantial similarity is all that is required. (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538.) The 401 and 401—S are the same basic models, and at a certain point the similarity of circumstances goes only to the weight to be accorded to such evidence, not its admissibility. (See *Leischner v. Deere & Co.* (1984), 127 Ill. App. 3d 175, 177, 468 N.E.2d 182, 183; *Charleston National Bank v. International Harvester Co.* (1974), 22 Ill. App. 3d 999, 1005, 317 N.E.2d 585, 590.)

If the number of accidents to users dropped dramatically when the safety devices were added, it would support plaintiff's claim that failure to include them was unreasonable.

Nonetheless, to preserve error based on an evidentiary exclusion, the proponent of the evidence must make an offer of proof. Plaintiff's counsel initially suggested to the judge that Stockmeir would answer that there were no reports of accidents on the S-series. However, during the same side-bar discussion, counsel indicated that he did not precisely know the number of accidents because the judge had refused to enforce the Rule 237 notices. The judge responded that counsel had had six years to find the answer.

A formal offer of proof, in the form of questions to the witness outside the hearing of the jury, is no longer always required. (See *Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 390 N.E.2d 417.) However, unsupported speculation by counsel is an insufficient offer of proof. A party cannot obtain reversal based on the failure to admit evidence, without showing, truthfully, what that evidence would be, in order to allow the reviewing court to assess the prejudice from the exclusion. (*Lukas v. Lightfoot* (1985), 131 Ill. App. 3d 566, 569, 476 N.E.2d 1, 3; *People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 91, 438 N.E.2d 924, 930.) There is simply no indication that plaintiff's counsel had any basis for saying that Stockmeir would testify that there had been no accidents on the S-series. Plaintiff's claim of error must fail.

■ Plaintiff next argues that the circuit court erred in refusing to require Hobart to produce reports on substantially similar accidents. In interrogatory No. 33 directed to Hobart, plaintiff asked whether there had been any accidents with the 401 cover raised or removed. Hobart produced a list of 12 accidents and included the names of the persons injured (if known), the locations and the dates of the accidents. Two of the accidents occurred with the guard raised and six with it removed. The position of the guarding mechanism was unknown for the remaining four accidents. Five years after receiving this answer, plaintiff filed a Rule 237 notice requesting that Hobart produce "any and all records and files pertaining to the occurrences" listed in the interrogatories. Seven months later, Hobart objected that plaintiff's notice was overbroad and untimely. In the meantime, plaintiff took no other steps under Supreme Court Rule 219 (103 Ill. 2d R. 219) to compel Hobart's compliance with the notice. On the first day of trial, plaintiff renewed her request for documents pertaining to Hobart's response to interrogatories. The court denied the motion to compel, noting that plaintiff had received the responses to the inter-

rogatories some five years earlier and should have taken action sooner.

It is clear that neither Hobart nor plaintiff were diligent in this situation. It is within the trial court's discretion to weigh the equities and make the final determination with respect to discovery orders. (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 587-90, 434 N.E.2d 511, 518-19; *Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 678-81, 403 N.E.2d 1, 13-15.) Supreme Court Rule 201(f) (87 Ill. 2d R. 201(f)) provides that the trial of a case shall not be delayed to permit discovery unless due diligence is shown. Had evidence of prior accidents been so crucial to plaintiff, we question why she waited five years to discover the specifics. We find no abuse of discretion.

██ Similarly, plaintiff argues that the circuit court also erred in preventing the introduction of Hobart's response to interrogatory No. 33 that there had been at least eight other accidents with the 401 cover raised or removed. The court ruled that no foundation had been laid because plaintiff could not show that these accidents occurred while the tenderizers were operating.

As discussed above, testimony as to reasonably similar occurrences is admissible in strict liability actions to show that the accident was caused by a dangerous or unsafe condition of the product. (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538; E. Cleary & M. Graham, Illinois Evidence sec. 401.15 (4th ed. 1984).) However, plaintiff's theory of the case was that the 401 was unreasonably dangerous because it continued to operate after the cover was lifted. Thus any evidence of accidents while the machine was not operating would be irrelevant. (See *Dukes v. J. I. Case Co.* (1985), 137 Ill. App. 3d 562, 575-76, 483 N.E.2d 1345, 1354-55. *Cf.* also *Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 1109-12, 427 N.E.2d 608, 614-15.) Plaintiff points to nothing in the record to indicate that Hobart received notice only of accidents that occurred when the tenderizer was turned on. Furthermore, plaintiff cannot attribute her inability to lay a foundation to Hobart's failure to produce documents pursuant to Rule 237(b). In contrast to Supreme Court Rule 214 (87 Ill. 2d R. 214), Rule 237(b) is not a general discovery rule (see *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 591-92, 434 N.E.2d 511, 521), rather it is designed to compel parties to produce documents or tangible things *at trial*. (See 87 Ill. 2d R. 237(b).) Plaintiff had more than five years after learning the locations of the other accidents and the names of the persons involved to investigate facts necessary to lay a foundation. This she failed to do. We find no abuse of

discretion in the court's refusal to admit Hobart's response to interrogatory No. 33.

Plaintiff next contends that the circuit court erred in directing a verdict in favor of defendant Certified Grocers. Plaintiff argues that she raised a factual question for the jury as to whether Mizyed-Yassin Corporation was acting as Certified's agent. Plaintiff made an offer of proof that Certified's president had suggested to the previous owners of the grocery store that the meat tenderizer be located where plaintiff encountered it, so that customers could see it. However, it is not clear that Mr. Mizyed or plaintiff's father was aware of certified's president's statement, and there is no indication that Certified could have compelled the two men to keep the machine in that place.

In *Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 373 N.E.2d 1371, the plaintiff had been a restaurant employee who was injured on a meat slicer when she was 15 years old. She filed suit against the restaurant franchisor, claiming negligence and wilful and wanton misconduct. The Second District Appellate Court upheld a directed verdict for the franchisor. Plaintiff's theory of liability was that the franchisor was aware that minors operated the beef-slicing machine in violation of State and Federal child-labor laws and that it had the power to prevent the violations but did nothing. The franchise agreement with the restaurant dealt only with maintenance of goodwill for the franchise name and minimum work hours of the restaurant employees, and the franchisor did not retain day-to-day supervisory control. The court looked to independent contractor cases as an analogy. In such cases it is held that if the employer of an independent contractor retains control over the operative details of the injury-causing work, he or she can be liable for the negligence of the contractor. (See *Kuberski v. Noonan* (1974), 23 Ill. App. 3d 237, 238, 318 N.E.2d 677, 679; *Pasko v. Commonwealth Edison Co.* (1973), 14 Ill. App. 3d 481, 489, 302 N.E.2d 642, 648-49.) However, the mere reservation of a general right to order that work be stopped, to inspect its progress, to receive reports or to make suggestions, does not subject the employer to such liability. (See *Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 639, 295 N.E.2d 41, 50.) The *Coty* court stated:

> "The franchisee is not in any usual sense an independent contractor of an 'employer.' However, the general rationale of the cases, that a person who possesses a right to supervise the internal operations of another's enterprise, which includes a right to veto an unsafe procedure, may be liable for the negligent failure to do so, can be applied to the franchise cases. However, this right to interdict unsafe practices must consist of something

more than a general right to make suggestions or recommendations or to order the work stopped or resumed. [Citation.] Here the franchisor did not retain the right to directly order children-employees away from the meat slicing machines nor could it have 'stopped the work' because the franchisee refused to order such employees away from the hazard. [Citation.]

The franchisor here, it is true, did retain a right to terminate the entire franchise agreement *** for breach of any covenant. One of these covenants required faithful observance by the franchisee of all relevant laws ***. The franchisor could, therefore, have requested or demanded that the franchisee stop employing children in the proscribed manner and if the franchisee failed to comply could have terminated the entire franchise agreement. This general right to rescind the contract or 'call off the work' is insufficient, however, under the reasoning of the cited cases to subject the franchisor to liability under either agency or employer-independent contractor theories." (*Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 242, 373 N.E.2d 1371, 1376.)

See also *Richardson v. Bulk Petroleum Corp.* (1973), 11 Ill. App. 3d 655, 297 N.E.2d 405 (gas-station landlord, with right to terminate lease for breach, did not exercise such control over tenant that it could be held liable for injury to tenant's customer although landlord's sales supervisor periodically inspected station and "counselled" station operators on certain business practices).

Similarly, in the present case, Certified had, at most, a franchise relationship with Mizyed-Yassin Corporation, and its franchise agreement dealt only with methods of payment and procedures for delivery of goods the franchisee ordered from it—not safety. Certified's only remedy for a violation of its rules was to withdraw permission to use its name and terminate the agreement. Plaintiff's father and her uncle both testified that they exercised day-to-day control over the grocery store and that they alone had the power to hire and fire employees. There was no agent-principal relationship and no evidence that Certified had the authority to compel or to prevent Mizyed-Yassin or its employees from operating the tenderizer in a manner that resulted in plaintiff's injury. We conclude that Certified cannot be held liable in this case under a principal-agent theory.

■■■ Plaintiff also contends that although Certified was not required to inspect the grocery store, once it did so it was required to exercise due care and to properly instruct plaintiff's uncle and her father. (See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199

N.E.2d 769.) In support of her theory that Certified negligently performed a voluntary undertaking, plaintiff notes that Certified's inspectors visited the store two to three times per month and that they once told Mizyed to mop up meat juices that had spilled onto the floor under the tenderizer. Mizyed testified that Certified inspectors were present while the machine was operated without a cover and with children nearby. However, there is no indication that the purpose of the inspections was to ensure employee or customer safety, as opposed to proper sanitation and compliance with the law. The scope of the duty to guard against negligence in a voluntary undertaking is limited by the extent of the undertaking. *McColgan v. United Mine Workers of America* (1984), 124 Ill. App. 3d 825, 827, 464 N.E.2d 1166, 1167.

In *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 210-11, 399 N.E.2d 596, 600, in reversing the dismissal of a claim that a security agency had negligently failed to protect the plaintiff from criminal attacks in public housing, our supreme court ruled that section 324A of the Restatement (Second) of Torts is applicable in Illinois. That section states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Restatement (Second) of Torts sec. 324A (1965).)

There is no evidence that Certified's inspectors did anything to increase the risk of harm and no indication that Certified's inspection was intended as a substitute for protection that the grocery store would otherwise provide its customers or its employees. Subsection 324A(c) suggests the only possible basis for liability. The rationale for such liability is that "[w]here the reliance or of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." (Restatement (Second) of Torts sec. 324A, comment *e* (1965).) Plaintiff contends that Mizyed and her father were inexperienced in grocery matters and depended on the expertise that Certified could bring to bear. However, the danger in operating a

tenderizing machine with no cover when children are nearby is obvious, and plaintiff cannot argue that the inspectors' failure to cite it was an endorsement of the practice or caused a disregard of adequate safety precautions. Moreover, there is no evidence that the inspectors were aware that Mizyed would leave the machine running unattended. The peril of doing so is clear, even to the inexperienced, and plaintiff cannot argue that Mizyed-Yassin Corporation or her father and uncle reasonably relied on the lack of explicit warnings from Certified. (See *Chisolm v. Stephens* (1977), 47 Ill. App. 3d 999, 1007-08, 365 N.E.2d 80, 86-87 (suit against a landlord for failure to repeat earlier voluntary undertakings to clear sidewalk of sleet and snow, the court stated, "to justify reliance plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts *** [t]he existing condition of an icy sidewalk was not a hidden defect"—it was still snowing and sleeting when plaintiff slipped and fell).) Thus, we conclude that the circuit court properly directed a verdict in favor of Certified.

 Plaintiff next argues that the court improperly directed a verdict in favor of defendant U.L. on her strict liability claim. However, the jury returned a special verdict that the 401 was not unreasonably dangerous. Strict liability is based on a conclusion that a product is unreasonably dangerous (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 210-12, 384 N.E.2d 368, 372), and we have rejected all of plaintiff's assignments of error that could have a possible bearing on the jury's special verdict (*cf. Klavine v. Hair* (1975), 29 Ill. App. 3d 483, 486-89, 331 N.E.2d 355, 358-59). Given the correctness of the jury's special finding, the result would have been no different had a strict liability claim against U.L. gone to the jury. (See *Merritt v. Greves* (1979), 82 Ill. App. 3d 863, 867, 403 N.E.2d 475, 478 (a special verdict that is not against the manifest weight of the evidence controls over a general verdict).) Thus we need not decide whether the circuit court was correct in ruling that strict products liability is inapplicable to independent testing laboratories.

The jury did consider plaintiff's claim that U.L. was negligent in performing its voluntary undertaking to test the 401. (See *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E.2d 596; *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769.) Our research has uncovered only a paucity of suits against independent testing laboratories arising from injuries from products tested. (See generally Annot., 39 A.L.R. 3d 181 (1971).) In the most famous of these, *Hanberry v. Hearst Corp.* (1969), 1 Cal. App. 3d 149, 81 Cal. Rptr. 519, the court held that plaintiff stated a claim for "negligent misrepresentation" against the originator of the "Good Housekeeping

Seal" for its statement that the shoes that caused plaintiff to slip and fall were "good ones." More on point is *Hempstead v. General Fire Extinguisher Corp.* (D. Del. 1967), 269 F. Supp. 109, in which the plaintiff alleged that he was injured by the explosion of a fire extinguisher that was listed by U.L., the same defendant in the instant case. The court noted that a U.L. listing constituted tacit approval of the product's design and unquestionably helped the manufacturer to sell the product. Relying on the Restatement (Second) of Torts, sec. 324A, which, as noted above, has been cited with approval by our supreme court (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 210-11, 399 N.E.2d 596, 600), the Federal district court concluded that, under Virginia law, the plaintiff stated a claim against U.L. for negligent performance of a voluntary undertaking. We assume, without deciding, that such suits against independent testing laboratories can be brought in Illinois as well and proceed to consider plaintiff's assignments of error with respect to U.L.

In presenting her case, plaintiff argued that U.L. failed to follow its own standards, and she introduced into evidence paragraphs 91—A through 91—C of the standards for "motor operated appliances." These paragraphs state that blades and feeding mechanisms should be designed to prevent accidental contact by the operator except where exposure is necessary for the cutting or slicing operation. Plaintiff objects to the introduction of paragraph 88 of the same standard, which requires that protection be provided to reduce accident hazards to an "acceptable degree," and to paragraph 89, which states that the adequacy of guards and interlocks should be determined from a study of the complete appliance "and the likelihood of accidents resulting from other than gross negligence." Because plaintiff introduced portions of the standard for appliances in attempting to establish her theory that 401 violated the standard, the other paragraphs were properly admitted for the sake of the jury's complete understanding. (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 555-56, 356 N.E.2d 779, 785-86.) It is difficult to see how plaintiff could have been prejudiced by this evidence, and she provides no convincing argument that they would otherwise be inadmissible.

In a similar vein, plaintiff argues that the court erred in allowing a U.L. disclaimer of liability, contained in its publication "Testing for Public Safety," to be read into evidence. However, during the course of the examination of U.L.'s Robert Seelbach, plaintiff's attorney read to the jury extensive portions of this publication concerning U.L.'s stated objectives and the nature of its activities. On cross-examination, U.L. merely introduced other excerpts about the same subject matter, the

scope of U.L.'s activities. Having opened the door on direct, plaintiff cannot complain about the remaining portions of the document that came out during cross-examination. Moreover, the jury was instructed that U.L. had a duty to determine whether the 401 complied with U.L.'s standards. We will not assume that the jury disregarded these instructions and decided the case based on U.L.'s disclaimer.

■■■ Plaintiff next argues that the court erred in denying her motion for change of venue, to have the case tried before a different judge (Ill. Rev. Stat. 1985, ch. 110, par. 2—1001(b)), and that all orders entered after improper denial of such a motion are void. (See *Intini v. Schwartz* (1979), 78 Ill. App. 3d 575, 579, 397 N.E.2d 84, 87.) A motion for change of venue as a matter of right is untimely if filed after the trial court has ruled on substantive matters. (*In re Marriage of Pruitt* (1981), 101 Ill. App. 3d 755, 758, 428 N.E.2d 732, 734; *In re Estate of Roselli* (1979), 70 Ill. App. 3d 116, 120-22, 388 N.E.2d 87, 90-91.) Before plaintiff made her motion on March 18, 1983, the judge had ruled on motions *in limine* and a motion for appointment of a guardian *ad litem*. Nonetheless, plaintiff argues that she may present a petition for change of venue if based upon specific allegations of newly discovered prejudice. (See *M. Loeb Corp. v. Brychek* (1981), 98 Ill. App. 3d 1122, 1128, 424 N.E.2d 1193, 1199; *Pavlis v. Jewel Tea Co.* (1977), 53 Ill. App. 3d 287, 288-89, 368 N.E.2d 719, 720-22; Ill. Rev. Stat. 1985, ch. 110, par. 2—1001.) In her motion for change of venue, plaintiff asserted that the trial judge might be called as a witness in the case and that in statements made privately and in open court he evidenced "prejudice" and an "adverse attitude" against her. Plaintiff never suggested any basis for the claim that the judge would be called as a witness, but her counsel stated that the judge had "intimidated" plaintiff's parents by telling them that they would lose the case before the jury and should consider settlement. Then, in an about-face, counsel admitted that the judge had not recommended that plaintiff accept any settlement offer, and the record shows that the judge earlier denied a motion for appointment of a guardian *ad litem* made because of plaintiff's parents' refusal to accept a settlement offer and plaintiff's father's ownership of defendant Mizyed-Yassin Corporation. When the judge met privately with plaintiff's parents, it was at her counsel's request. We find plaintiff's motion for change of venue to have been wholly meritless.

■■■ Plaintiff finally argues that the jury verdict awarding $300,000 is inadequate. Plaintiff contends that she was inadequately compensated for pain, fear, and her sense of helplessness, and the anxiety, bed-wetting, nightmares, violent behavior, social difficulties, and phantom pain syndrome that are all a result of her accident. Further-

more, plaintiff's total medical bill was $9,700. The evidence showed that she will have to buy 16 prostheses throughout her lifetime, costing a total of $45,760. If fitted with a myoelectric hand, the cost would be $104,000, plus $11,210 for 59 replacement gloves over her lifetime. There was also evidence that plaintiff's loss of income and cost of psychological counseling would be $746,041 in present value.

Defendants counter that the evidence supporting damages was equivocal at best and that the loss-of-income testimony by Dr. Dobbelaere was based on an erroneous assumption that plaintiff was "mentally defective," although Dr. Geist, a psychologist, later admitted that plaintiff's I.Q. was 85, which is in the normal range. Defendants also note that in calculating the present value of plaintiff's projected income, Dr. Dobblaere assumed a real interest rate of 3%, but he conceded on cross-examination that a real interest rate of 5 to 6% would be reasonable. This would reduce his estimate of present cash value by as much as 40%. Defendants further argue that plaintiff presented no evidence that she could in fact wear a myoelectric device. The amount of damages is a question of fact for the jury and will not be overturned on appeal unless it is palpably inadequate, against the manifest weight of the evidence, or it is clear that the jury disregarded a proven element of damages. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502-04, 481 N.E.2d 50, 53-54; *Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 194-98, 412 N.E.2d 1037, 1047-50.) We simply cannot say, based on the record before us and the arguments of counsel, that the amount awarded was inappropriate.

We have considered plaintiff's other arguments and find them to be without merit. Given our resolution of the case, we need not consider defendant Hobart's argument that the doctrine of strict liability was improperly applied to it, and we need not address the argument of U.L. and Hobart that the damage award against Mizyed-Yassin Corporation eliminates the necessity for our review of trial errors allegedly committed with respect to them.

The judgment of the circuit court is affirmed.

Affirmed.

BILANDIC, P.J., and SULLIVAN, J., concur.