ALEX CASTRO, a Minor by and through his Father and Next Friend, Zenon Castro, Plaintiff, v. CHICAGO PARK DISTRICT *et al.*, Defendants (Chicago Park District, Third–Party Plaintiff-Appellant; Eugene Gembara, Third–Party Defendant-Appellee).

First District (2nd Division)   No. 88—0515

Opinion filed December 30, 1988.

William J. Floriano II, of Chicago (Fraterrigo, Best & Beranek, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (James M. Mulcahy and Susan A. Jardine, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

·This appeal arises from the circuit court's order granting a directed verdict for the third-party defendant in an action for contribution.

On June 4, 1981, Alex Castro, a minor, was hit by a foul ball while seated on the player's bench during a game in St. Barbara's Little League (League) being played at a baseball diamond in McGuane Park, part of the Chicago Park District (Park District). Castro filed suit against the Park District, alleging that it carelessly and negligently designed and built the baseball diamond in that a large, unsafe opening existed between the end of a backstop fence and the beginning of another fence in front of the player's bench.

The Park District filed a third-party complaint for contribution against Eugene Gembara, the president of the League, and Louis Cannova, Castro's team manager. The third-party complaint alleged that there was a careless and negligent failure to make and enforce rules that would have prevented Castro's injury, and that there was negligent supervision of Castro at the time of his injury.

On January 22, 1986, the Park District and Cannova entered into a settlement with Castro. The Park District ultimately proceeded to trial on the third-party complaint, seeking contribution from Gembara.

At trial, Gembara testified that he was the president of the League, which was originally founded by a group of neighbors. Gembara "rejuvenated" the League in 1975, after it had been "dormant for two years," but was not paid for his participation. As president, he purchased equipment for the players in the League, including batting helmets, which were in part intended to protect the players from foul balls. Gembara acknowledged that he had the safety of the players in mind when he purchased the helmets.

In his capacity as president, he received permission to play the League's games at McGuane Park. The Park District provided only the facility. To get players, Gembara advertised among different schools. The ages of the players ranged from 9 to 13 or 10 to 14.

In 1981, Gembara was no longer an active coach. He had a good deal of previous experience in that capacity. He testified that he formulated the rules of the League jointly with other officers and managers; in his deposition, however, he described his role in the League as "more like a dictatorship." He admitted that he maintained a veto power over the selection of the rules, which he characterized as basically for safety. None of the written rules, however, directed where the players were to sit on the bench. Gembara remembered telling the

coaches to instruct the players to sit back on the bench away from the gap, but could not recall whether this rule was adopted before or after Castro's injury. He also suggested that there were additional rules not in writing, but understood among the coaches and managers. Prior to the injury, he knew that the opening between the fences existed, but never complained to the Park District. He was not at the field when Castro was injured.

Terrence Kurtz, a manager of one of the teams in the League, testified that he did not recall the safety of the players ever being discussed in preseason meetings in 1981. He did not remember all the safety rules in place in 1981, but recalled that, as manager, he instituted certain safety rules for his team. He always made sure his players were seated on the bench and far enough away from the opening between the fences so that they would not get hurt. He stated that there were unwritten understandings between managers about safety. He also testified that Gembara did not own the League.

Next, Robert Clark, a teammate of Castro, testified that the equipment for the game was usually kept in the opening between the fences. He stated that he was next to Castro when the injury occurred and that Castro had been sitting on the bench in the open area. He recalled that he was given a set of written safety rules as a player, but did not know of any rules given to the coaches. He did not see Gembara present when the injury occurred.

Thomas Green, the park supervisor, testified that Gembara asked him for permission to use the baseball fields in McGuane Park. It was an oral agreement, with no fee involved, and the Park District provided only the facility. He acknowledged that it was his responsibility as supervisor to walk around the park looking for unsafe conditions, but was not aware of any safety hazards on the fields he permitted the League to use. Green also swore that he never discussed the safety features of the fields with Gembara, nor safety rules, and he did not know of any written safety rules applicable to the baseball diamonds.

The last witness called by the Park District was Castro, the player who was injured. He signed up for the League in the school gym at St. Barbara. He had no previous experience in organized baseball and played in only five or six games before his injury. He received no safety instructions and could not remember if the League rules were given to him. At the time of the injury, he was seated on the bench near home plate, in the area of the opening. He did not remember anyone telling him to sit back away from this area. While seated there, he was injured by a foul line drive, although he was wearing a batting helmet.

The Park District then rested. Pursuant to a motion, the circuit court directed a verdict for Gembara and against the Park District "on the basis of the lack of probable cause and the lack of foreseeability."

The Park District's motion for a new trial was denied, and it appeals.

■ The Park District's contention on appeal is that the circuit court erred in directing the verdict in Gembara's favor. The propriety of a directed verdict must be judged according to the standard set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, that verdicts should be directed only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18, citing *Pedrick*, 37 Ill. 2d at 510.

■ To establish negligence, the underlying cause of action in this case, a plaintiff must show the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately resulting from the breach and damages. (See *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374, 308 N.E.2d 617; *Martello v. Century Supply Co.* (1987), 163 Ill. App. 3d 521, 523, 516 N.E.2d 763.) The determination of the question of duty is an issue of law to be resolved by the court. (*Walsh v. A.D. Connor, Inc.* (1981), 99 Ill. App. 3d 427, 430, 425 N.E.2d 1153.) Although the existence of a legal duty is sometimes considered in terms of foreseeability, duty is not bottomed on foreseeability alone. (*Hoffman v. Vernon Township* (1981), 97 Ill. App. 3d 721, 724, 423 N.E.2d 519.) Other factors to be taken into consideration include whether the relationship between defendant and plaintiff imposes a legal obligation upon defendant to act with reasonable care toward plaintiff; the likelihood of injury; the magnitude of the burden of guarding against the injury; and the desirability of placing that burden upon defendant. (*Martello*, 163 Ill. App. 3d at 523.) Once duty, a prerequisite in a negligence claim, is established, whether the duty was breached and the breach proximately caused an injury are fact questions to be determined by the trier of fact. *Anderson v. Woodlawn Shell, Inc.* (1985), 132 Ill. App. 3d 580, 582, 478 N.E.2d 10.

A review of the record reveals no specific determination by the circuit court as to whether a duty on Gembara's part existed; rather, it based the directed verdict on "lack of probable cause" and "lack of foreseeability." As a result, this court must determine whether a duty existed as a matter of law and, if so, whether a directed verdict was proper under *Pedrick*.

■ The relationship between Gembara and the League partici-

pants imposed a legal obligation on Gembara to act with reasonable care toward Castro, since children, ages 9 to 13 or 10 to 14, were participating in the League.

In *Crohn v. Congregation B'nai Zion* (1974), 22 Ill. App. 3d 625, 317 N.E.2d 637, a seven-year-old plaintiff was struck in the face with a baseball bat swung by a 10-year-old while both were attending a summer day camp. The *Crohn* court held that the defendants, who conducted the day camp, had a duty to provide both a safe place to play and adequate supervision for their activities. (*Crohn*, 22 Ill. App. 3d at 631.) After reviewing the above-mentioned factors that must be considered in imposing a duty, the appellate court stated:

> "The duties and responsibilities of an organization to which the care or control of children is entrusted are sometimes said to be akin to the duties and responsibilities of parents. [Citation.] Such an organization is not an insurer of the safety of children involved. On the other hand, such an organization may not avoid liability for injuries resulting from its failure to exercise reasonable care." (*Crohn*, 22 Ill. App. 3d at 630, citing *Reid v. YMCA* (1969), 107 Ill. App. 2d 170, 174-75, 246 N.E.2d 20.)

The fact that children are involved imposes on those in charge of their safety the obligation of exercising more vigilance and caution to reach a level of ordinary care than might be sufficient with respect to an adult. *Stanley v. Board of Education* (1973), 9 Ill. App. 3d 963, 968, 293 N.E.2d 417.

In *Loosier v. Youth Baseball & Softball, Inc.* (1986), 142 Ill. App. 3d 313, 318, 491 N.E.2d 933, the appellate court observed that a defendant baseball league had a duty to supervise the activity of its baseball and softball games while the players were on the field actively participating in the sport and entrusted by their parents to their coaches, consistent with *Crohn*. As a preliminary finding, following the reasoning of these cases, we hold that the League had a duty to supervise and safeguard its participants.

Should this legal obligation be imposed on Gembara as a matter of law, by virtue of his relationship to Castro? Although he did not own the League, nor was he the only administrator, there was much evidence that suggested Gembara completely controlled most of the League's vital functions: he was its new founder; he controlled most of its administrative operations, including formation of the schedule, registration of players, and organization of the board of directors; he assisted in the drafting of League rules maintaining a "veto power" over this process; he represented the League in its negotiation for a playing field with the Park District; and, he, himself, characterized his associa-

tion with the League as a "dictatorship." Further, the League was not an independent legal entity, such as a not-for-profit corporation, nor was it sponsored; it was an informal organization created by neighbors. Gembara, the organizer, chief administrator, and president of the League must be held accountable for the League's activities. Under the circumstances of this case, considering the relationship between Gembara, the chief administrator of the League, and Castro, a participant, we are compelled to find that Gembara had the duty to act with reasonable care for the safety of Castro.

The nature of the activity here was little league baseball; the potential for injury not only existed, but was likely. Indeed, this possibility was recognized by Gembara, who instituted safety rules and purchased safety equipment.

■ The next factor to be considered is the magnitude of the burden of guarding against the injury. Gembara initially argues that since he is a volunteer, imposition of such a duty would be unreasonable, unduly burdensome, and the end result would be that people would no longer volunteer. We disagree. A duty voluntarily assumed must be performed with due care or such competence and skill as one possesses. (*Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 317, 412 N.E.2d 472.) Nor is this duty overly burdensome. The scope of the duty to guard against negligence in a voluntary undertaking is limited by the extent of the undertaking. (*Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 1070, 502 N.E.2d 315.) Gembara cannot escape a duty of ordinary care simply because he is a volunteer, particularly where the welfare of children is entrusted to him. (See *Stanley*, 9 Ill. App. 3d at 968.) He is not an insurer of the player's safety, but he must exercise reasonable care to the extent of his undertaking, here the organization and administration of the League. (See *Crohn*, 22 Ill. App. 3d at 630.) Gembara exaggerates in his brief the extent of that burden in this case. Additional rules may have been all that were necessary to sufficiently guard against this injury. The magnitude of the burden of guarding against the injury, therefore, was not great.

■ Is it desirable to place this burden on Gembara? He was a volunteer and was the president of a League that was beneficial to the community. As Gembara suggests, persons may be discouraged from volunteering in organizations if they discover they might be liable for negligence; however, responsibility must be a part of such participation. When children are entrusted to the care of an organization, it must act with due care and caution for the safety of its participants. It cannot matter that the persons running the organization are volun-

teers. In an informal organization such as this League, Gembara, who appointed the board of directors, had veto power over the rules, and ran the League with certain, self-admitted autonomy, must be held to have personally accepted this burden.

This determination of duty is only the initial step in a negligence action. Whether or not Gembara's actions were reasonable in promulgating rules, organizing the League, selecting the playing field, and supervising the operations of the League is a factual question. So, too, is the determination of whether Gembara's actions proximately caused the injury to Alex Castro. See *Crohn*, 22 Ill. App. 3d at 631.

■ ■ Questions of negligence, due care and proximate cause are ordinarily questions of fact for a jury to decide and can only become questions of law when the facts are undisputed and there can be no difference in the judgment of reasonable men to the inference to be drawn from them. (*Thomas v. Northington* (1985), 134 Ill. App. 3d 141, 146-47, 479 N.E.2d 976.) Because the circuit court below directed a verdict for Gembara, the propriety of its order must be measured under *Pedrick*. The evidence in this case, viewed in a light most favorable to the Park District, shows that Gembara selected a field that contained a dangerous condition, drafted and maintained veto power over rules that failed to protect the players on the bench from foul balls, and did not warn the players or coaches of the potential danger that existed. Further, he was an experienced baseball coach who should have had extensive knowledge of the hazards inherent in baseball. Whether Gembara's actions as president and organizer of the League were negligent and whether they proximately contributed to Castro's injury were questions of fact for the jury. The inferences which reasonably might be drawn from the evidence cannot be said to so overwhelmingly favor Gembara that no contrary verdict could ever stand. *Pedrick*, 37 Ill. 2d at 510.

The circuit court erred in directing a verdict for defendant Gembara. It should have recognized that duty existed; further, since evidence was presented that, viewed most favorably to the Park District, raised inferences and questions of fact that should have been decided by the jury, a directed verdict was improper. For the foregoing reasons, the decision of the circuit court must be reversed and the cause remanded for a new trial.

Reversed and remanded.

SCARIANO and EGAN, JJ., concur.