DELBERT YATES, JR., a Minor, by Delbert Yates, Sr., his Father and Next Friend, Plaintiff-Appellee, v. CHICAGO NATIONAL LEAGUE BALL CLUB, INC., Defendant-Appellant.

First District (1st Division)   No. 1—90—1209

Opinion filed April 6, 1992.—Rehearing denied June 23, 1992.—
Modified opinion filed June 29, 1992.

474

Tressler, Soderstrom, Maloney & Priess, of Chicago (Francis A. Spina and William J. Cremer, of counsel), for appellant.

Thomas R. Cirignani & Associates, of Chicago (Thomas R. Cirignani, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Minor-plaintiff Delbert Yates, Jr., by Delbert Yates, Sr., his father and next friend (Mr. Yates), brought suit in the circuit court of Cook County against defendant Chicago National League Ball Club, Inc. (the Chicago Cubs or Cubs), for injuries resulting from being struck by a foul ball while attending a baseball game. Plaintiff alleged that defendant negligently: (1) failed to provide adequate screening in the area behind home plate; and (2) failed to warn him so as to enable him to avoid the harm. Following a jury trial, judgment was entered on a verdict rendered in favor of plaintiff; defendant now appeals.

The record on appeal contains the following facts. Mr. Yates testified that on August 20, 1983, he attended a baseball game between the Atlanta Braves and Chicago Cubs. Mr. Yates' wife, four of their daughters and plaintiff, Delbert Yates, Jr., also attended the game. Mr. Yates had previously purchased eight tickets for the game through Carson, Pirie Scott in Merrillville, Indiana. Mr. Yates testified that he had requested tickets behind home plate.

The Yates family arrived at the ballpark between 12:30 and 1 p.m. and had difficulty finding a place to park their car. By the time they

were admitted to the park, the game had already started; an usher showed the family to their seats. Mr. Yates testified that he took the first seat, whereas plaintiff took the seventh seat, leaving the eighth seat empty. Mr. Yates felt that his seat was protected by a screen in place behind home plate.

During the game, Leon Durham came up to bat and hit a foul ball which struck plaintiff. Mr. Yates testified that he saw the ball hit his son, after which he saw a knot under plaintiff's eye and saw blood pouring down plaintiff's face. According to Mr. Yates, two people came and took plaintiff to a first aid station. Plaintiff was then taken to the hospital. Plaintiff's injury required surgery and a hospital stay of at least five days.

Mr. Yates testified that in the 90 days following the surgery, plaintiff continued to have excruciating headaches. In addition, whereas plaintiff had played basketball and organized baseball prior to being injured, he could no longer really hit or catch the ball. Plaintiff had become withdrawn and stayed in his room most of the time.

On cross-examination, Mr. Yates testified that he had been to Wrigley Field two or three times before the date of the accident. Mr. Yates was aware that balls would leave the field and go into the stands. Mr. Yates had previously sat in a seat not protected by a screen. Although the diagram he was shown at the time of purchasing tickets did not indicate the position of the screen, Mr. Yates assumed that the seats he was shown behind home plate would be behind the screen. Defense counsel sought to impeach Mr. Yates with prior deposition testimony in which Mr. Yates stated he asked for tickets "behind the home plate around the screen." Defense counsel also sought to impeach Mr. Yates with prior deposition testimony in which Mr. Yates stated he did not actually see the ball strike his son. Mr. Yates admitted that he had not sat in plaintiff's seat. On redirect, Mr. Yates testified that he was never told by the Chicago Cubs that his seats were not protected by the screen.

Mrs. Theda Yates, plaintiff's mother, testified that she did not see the baseball strike her son, but that, immediately thereafter, her son appeared as described above. Mrs. Yates' testimony concerning plaintiff's hospitalization and the change in plaintiff's activities was also similar to that described by Mr. Yates. Mrs. Yates also stated that plaintiff suffered from occasional double vision following the injury.

On cross-examination, Mrs. Yates testified that Mr. Yates requested seats behind home plate and behind the screen. Defense counsel read Mrs. Yates' prior deposition testimony into the record, in which she indicated that Mr. Yates had asked for seats behind the

screen "where we always sat but they were always [sic] sold." Mrs. Yates testified that she was aware that foul balls went into the stands at baseball games, which was why they bought the seats at issue. Mrs. Yates stated that she had not gone to plaintiff's seat to see whether the seat was protected.

Mrs. Yates was then shown defendant's exhibits 3, 4, 5, 6, 7, and 8, a series of photographs taken at Wrigley Field from a number of perspectives. Mrs. Yates agreed that whether the seats Mr. Yates bought appeared to be protected by the screen depended on the angle from which they were photographed. These exhibits were published to the jury.

On redirect, Mrs. Yates testified that the Cubs never told her that the seats her family were going to sit in were protected by the screen from some angles and not from others. Mrs. Yates also stated that she would not have sat in her seat if she had known it was not protected from foul balls.

Plaintiff testified that he was born on December 27, 1972. In 1983, plaintiff was in fourth grade at the Hazelnut Elementary School. Plaintiff attended the August 20, 1983, baseball game between the Atlanta Braves and Chicago Cubs, along with his parents and sisters. Immediately after plaintiff bet his sister Susan as to whether Leon Durham would get a hit, he was struck by a baseball. Plaintiff saw only a white blur before he was struck. Plaintiff then testified that he was taken to a first aid station, then to a hospital and later had surgery.

Plaintiff also testified that in the 90 days following the surgery, he had painful headaches almost every day and that he continued to have similar headaches once or twice a month thereafter. Plaintiff further testified as to his involvement with sports, particularly baseball. In the two or three years before the accident, plaintiff had played organized baseball as an outfielder, second baseperson and catcher. Plaintiff had one of the top five averages on his team. After the accident, plaintiff would see two baseballs when attempting to field a fly ball. Plaintiff did not play any other sports after the accident. Plaintiff also has trouble driving cars and climbing ladders.

On cross-examination, plaintiff stated that he had been to Wrigley Field approximately five times before the accident. He had also been to Comiskey Park on at least one occasion. Plaintiff admitted that he was aware that foul balls would leave the field. Plaintiff also admitted that from his experience as a baseball player, he knew that the ball could travel in many different directions after being hit. Plaintiff

could not remember whether the ballpark was crowded on August 20, 1983.

Plaintiff next read edited deposition testimony given by Allen R. Caskey into the record. Defendant's motion to strike the entire transcript was heard and denied outside the presence of the jury.

Caskey testified that he had obtained a bachelor's degree in 1964, a master's degree in 1965 and a doctorate in 1974; these degrees were in the field of recreation and parks administration and were received from the University of Illinois. He was president of A.R.C. Associates, Inc., a firm providing planning, design, construction, supervision and inspection, as well as operation, maintenance and safety consulting services, to park and recreation agencies. The facilities involved include swimming pools, tennis courts, basketball courts, playgrounds and softball and baseball facilities. Caskey had previously been involved with the planning, design and development of approximately 300 softball and baseball fields, ranging in size from a small backstop to a facility seating a few thousand spectators. Caskey had also previously consulted for the Chicago White Sox in a similar lawsuit.

Caskey testified that he had been retained by plaintiff to review documents regarding this lawsuit. After reviewing these documents, Caskey arrived at a number of opinions, based upon a reasonable degree of certainty within the area of design, construction and operation of a baseball stadium. Caskey opined that the seats in the "area behind home plate" should be protected at Wrigley Field. Caskey defined the "area behind home plate" as the area between the first and third base lines as if those base lines were extended into the stands. Caskey opined that this area was the most dangerous area of the ballpark because it has the highest probability of line drive foul balls which would have a short reaction time on the part of spectators.

Caskey testified that it would be feasible to protect spectators from foul balls by erecting a screen to prevent foul balls from entering the stands. Caskey also opined that plaintiff's seat on August 20, 1983, was in the area behind home plate, but was also in an unprotected area of the ballpark.[1] Caskey opined that screening could be extended down the first and third base lines, but a minimal amount of screening would be that which would cover the area behind home plate. Caskey concluded that plaintiff's injuries were caused by the

---

[1]We note that a diagram reflecting these areas was published to the jury, but was not included in the record on appeal. We also note that only two of the photographs referred to in Mrs. Yates' testimony were included in the record on appeal.

lack of protective screening and that defendant had not exercised reasonable care in providing safe seating in the area behind home plate.

On cross-examination, Caskey admitted that his undergraduate degree was in physical education and recreation; he could not recall anything in his undergraduate studies which related to major league backstops. Caskey stated that there would be different considerations in designing a major league baseball stadium than were present in designing baseball fields for high school or little league use, including the size of the facility, the size of the players and the speed of the ball. Caskey further stated that he had never designed or built a major league stadium. Caskey testified that he was neither a licensed architect nor an engineer; he stated that he did not have licenses in the professions requisite to designing a major league ballpark. Caskey admitted that he had never designed, built or published articles concerning major league backstops.

Caskey also admitted that he had not gone to Wrigley Field to make observations or take measurements regarding the seats and screen in this case. Caskey had not made time or distance calculations in this case, nor could he cite a specific study on the subject. Caskey's knowledge of the location of plaintiff's seat was based on photographs and a schematic diagram provided to him. Caskey did not know whether the diagram was to scale.

Caskey stated that in forming his opinions, he had relied upon various publications on the personal injury issue and his years of reading documentation on safety, design and operation of baseball stadiums and fields. He also stated that he could not recall any of those publications specifically addressing major league backstops. Caskey indicated that he was unaware of any major league studies regarding which areas of a ballpark carry the greatest risk of spectator injury from foul balls, nor had he conducted such a study himself.

Caskey was unaware of any major league standard concerning backstop size or defining the area behind home plate. Caskey agreed that it was not necessary to screen the entire ballpark, that the screen would end at some point and that seats beyond that point would be unprotected. Caskey had not conducted a study to determine whether the risk of a foul ball reaching plaintiff's seating area was greater than that of a foul ball reaching the area just beyond the area he defined as behind home plate. Nor had Caskey conducted a survey of the size of major league backstops. Caskey estimated that between 60% and 80% of his work in lawsuits was on behalf of plaintiffs.

Plaintiff called Paul Rathje as an adverse witness. Rathje testified that he was the Cubs' assistant director of stadium operations, a posi-

tion he had held since 1983. His department was responsible for stadium and field maintenance, as well as game-day personnel, such as ushers, security and first-aid personnel. Rathje testified that the screen in place in August 1983 had been installed in 1982. Rathje stated that the purpose of the screen was to protect "those sitting directly behind home plate." Rathje admitted that in a prior deposition, he had stated that the purpose was to protect "those sitting in the home plate area." Rathje defined the "home plate area" as the area between the extended first and third base lines. He considered the "area behind home plate" to be the most dangerous area of the ballpark, involving the majority of high-velocity foul balls. Rathje distinguished the "area behind home plate" from the "home plate area." He noted that foul balls could be hit directly into any unscreened area of the ballpark.

Rathje also testified that he was unaware of any materials indicating which seats were to be protected and of any safety analysis undertaken prior to erecting the screen in 1982. Rathje stated that there were no warning signs in the home plate area and that children were not barred from the home plate area.

Rathje further testified that he had previously gone to the ballpark with a seating chart in an attempt to determine which seats were protected by the screen. Rathje opined that plaintiff's seat was not in the protected area and was not protected by the screen. According to Rathje's calculations, the protected area encompassed 1,327 seats, which constituted approximately 4% of the total seats in the ballpark.

In later questioning, Rathje denied that 62 persons had been hit by foul balls between the first and third base lines and behind home plate in 1982. Rathje admitted that he had previously signed a sworn interrogatory which read to the contrary, but later testified that the number 62 represented the number of spectator accident reports for the entire ballpark in 1982. Rathje stated that there were 10 foul ball injuries in the "home plate area," as defined by Caskey, in 1982.

Defendant called Richard de Flon, senior vice-president and architect with the firm of Hellmuth, Kassabaum & Obata, to testify as an expert witness. de Flon received bachelor's degrees in environmental design and architecture from the University of Kansas. de Flon testified that he was a licensed architect in more than six States, was a member of the American Institute of Architects and the Missouri Council of Architects, and was accredited with the National Council of Architectural Registration Boards.

Since the 1970s, de Flon limited his work to the area of sports facility design; his work includes the Hoosier Dome in Indianapolis, Indiana, and the suites erected at Comiskey Park and Soldier Field in Chicago. Since joining the Hellmuth firm in 1983, he was involved in the design of between 10 and 15 minor and major league stadiums. de Flon was the principal in charge of the new Comiskey Park in Chicago and was also involved with projects in Baltimore, Maryland; Saint Petersburg, Florida; and Buffalo, New York.

de Flon testified that he had been retained by the Cubs to evaluate the screen at Wrigley Field. He visited the ballpark, viewed the backstop, sat in plaintiff's seat and measured the angle from the seat to the backstop. de Flon also indicated that the screen at issue was 73 feet wide and 30 feet tall.

de Flon then testified that an architect uses three criteria to determine the appropriate size for a screen: (1) the needs of the team; (2) the needs and desires of the fans; and (3) the physical configuration and constraints of the stadium. Based on a reasonable degree of architectural certainty and on his years of dealing with baseball teams and stadiums, de Flon testified that the screen at issue fell within major league standards of safety and adequacy. de Flon determined the standards of major league baseball by conducting a survey of the screens erected in each of the major league ballparks. These screens ranged in length from slightly less than 40 feet to over 120 feet. de Flon testified that the norm ranged between 65 and 75 feet, placing the screen at issue within the norm. He also stated that architects used historical data for the design process and that he was unaware of any codified standard for major league screens. de Flon opined that plaintiff's seat was unprotected.

On cross-examination, de Flon testified that he did not have a firm definition of the "area behind home plate," explaining that this area varies depending on the physical configuration of each stadium. He noted that different people define the term differently. de Flon admitted that other stadiums he visited had warning signs, but that Wrigley Field did not. He also opined that one did not have to have experience with major league ballpark design to be qualified to discuss the size of the screen.

de Flon stated that he did not believe any of the major league screens were inadequate. He further stated that it was not within his expertise to factor the trajectory and angle of balls in designing a protective screen.

The Cubs then called Thomas Cooper, who was employed as the director of stadium operations. Cooper testified that over 36,000 peo-

ple attended the game at which plaintiff was injured; this number would have been close to Wrigley Field's 1983 capacity. Cooper then testified as to the procedure followed when a spectator is struck by a foul ball. Cooper stated that a review of incident reports for 1982 did not indicate any incidents in the section where plaintiff was struck. Cooper also stated that there were two incidents in the immediate vicinity of that section. He further stated that many times, a spectator struck by a foul ball would not fill out an incident report.

Doctors Jack Arbit, Allen Putterman, Mark Greenwald and Elva Poznanski testified concerning plaintiff's injuries. Their testimony, however, is not at issue in this case.

At the conclusion of the trial, the jury returned a verdict for plaintiff in the amount of $67,500. Defendant filed a post-trial motion, which was denied. Defendant now appeals.

## I

Defendant first contends that the trial court should have granted its motion for judgment notwithstanding the verdict. Such a motion should be entered only in those cases in which all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 511, 229 N.E.2d 504, 513-14.) When deciding a motion for judgment *n.o.v.*, the court may not consider errors in the admission or exclusion of evidence. (*Gundich v. Emerson-Comstock Co.* (1960), 21 Ill. 2d 117, 128, 171 N.E.2d 60, 66.) A general verdict will not be set aside so long as one ground suffices to sustain the verdict "unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." Ill. Rev. Stat. 1987, ch. 110, par. 2—1201(d); see *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 412 N.E.2d 447.

We first address the Cubs' contention that the trial court erred in submitting the inadequate screening issue to the jury. We begin by taking notice of the position which the sport of baseball, particularly major league baseball, occupies in our nation's culture. (See *Flood v. Kuhn* (1972), 407 U.S. 258, 260-64, 32 L. Ed. 2d 728, 732-33, 92 S. Ct. 2099, 2101-03 (plurality opinion).) Indeed, baseball sometimes appears to occupy an anomalous position in American law as well. *Flood*, 407 U.S. at 282-83, 32 L. Ed. 2d at 743-44, 92 S. Ct. at 2112 (upholding the long-standing yet anomalous exemption of major

league baseball—as opposed to other sports—from Federal antitrust laws); see *Riley v. Chicago Cougars Hockey Club, Inc.* (1981), 100 Ill. App. 3d 664, 666, 427 N.E.2d 290, 292-93 (noting the historical rule of nonliability for spectator injuries at baseball games as opposed to hockey matches).

■ In the context of negligence law, this court has held that while a ballpark owner-occupier does not absolutely insure the safety of invitees on its premises, the owner-occupier does owe a duty of reasonable care to such invitees. (*Maytnier v. Rush* (1967), 80 Ill. App. 2d 336, 342, 225 N.E.2d 83, 87.) This duty is usually satisfied if the owner-occupier " 'provide[s] [a] screen for the most dangerous part of the grandstand and for those who may be reasonably anticipated to desire protected seats' " for a typical game. (*Maytnier*, 80 Ill. App. 2d at 343, 225 N.E.2d at 87, quoting *Brisson v. Minneapolis Baseball & Athletic Association* (1932), 185 Minn. 507, 509, 240 N.W. 903, 904.) This standard appears to be the majority rule. See *Akins v. Glens Falls City School District* (1981), 53 N.Y.2d 325, 330, 424 N.E.2d 531, 533, 441 N.Y.S. 2d 644, 648; see also *Coronel v. Chicago White Sox, Ltd.* (1992), 230 Ill. App. 3d 734, 737 (referring only to the "most dangerous part of the grandstand").[2]

■ The Cubs argue that they are entitled to judgment *n.o.v.* because the record showed there was a screen behind home plate, but plaintiff failed to introduce evidence regarding the average demand for screened seats.

The Cubs' formulation of the duty owed in this case is misconceived for two reasons. First, the *Coronel* court measured the owner-occupier's duty by whether the screen placed in the most dangerous area of the ballpark was adequate without reference to requests for screened seats. (*Coronel*, 230 Ill. App. 3d at 737, citing *Maytnier*, 80 Ill. App. 2d at 343, 225 N.E.2d at 87.) Second, there is a difference between the majority rule quoted above and one that states that ballpark owners are not liable "if they provide [a] screen [in] the most dangerous part of the grandstand *** for those who may be reasonably anticipated to desire protected seats" for a typical game. (See also *Clapman v. City of New York* (1984), 63 N.Y.2d 669, 468 N.E.2d 697 (summary judgment proper where no material fact existed on either

---

[2]An opinion in the *Coronel* case was initially filed on November 19, 1991. That opinion was the subject of plaintiff's motion for supplemental authority in this case, which was filed on January 10, 1992. On May 19, 1992, another opinion was filed in *Coronel* that reached the same conclusion as the first. The points in *Coronel* to which we refer herein appear in both opinions.

the adequacy of the screen or sufficiency of the number of seats behind the screen).) Thus, plaintiff was not required to produce evidence on the average demand for screened seats.

Accordingly, viewing the evidence most favorably to plaintiff, judgment *n.o.v.* was not warranted. The record indicates that Caskey and Rathje agreed on a definition of "the area behind home plate," though Rathje called it the "home plate area" and stated that only the area directly behind home plate was "the most dangerous area of the ballpark." de Flon testified that the definition of terms such as "the area behind home plate" may vary from stadium to stadium. The jury may have agreed with Caskey that defendant's failure to screen the area between the extended first and third base lines behind home plate was a breach of the duty of reasonable care in this case.

The Cubs argue that Caskey's testimony should have been excluded. However, as noted above, alleged errors in the admission of evidence are not considered in passing upon a motion for judgment *n.o.v.* Therefore, defendant has failed to demonstrate that judgment *n.o.v.* was required in this case.

## II

The Cubs alternatively seek a new trial on the inadequate screening theory. A trial court's ruling on whether a new trial should be granted will not be reversed unless the verdict is against the manifest weight of the evidence. (See *Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973.) A verdict is deemed to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based on any of the evidence. (*Villa*, 202 Ill. App. 3d at 1089, 560 N.E.2d at 973.) Unlike motions for judgment *n.o.v.*, a court may consider errors in the exclusion or admission of evidence and grant a new trial if there were serious and prejudicial errors made at trial. (See *Bartlett Bank & Trust Co. v. McJunkins* (1986), 147 Ill. App. 3d 52, 63, 497 N.E.2d 398, 406.) We turn again to consider the inadequate screening theory, focusing on defendant's allegations that it was prejudiced by errors in the admission or exclusion of evidence.

## A

The Cubs contend that the trial court erred in denying their motion to exclude Caskey's deposition testimony. Defendant suggests that Caskey was not qualified to comment on the adequacy of the screen. The Cubs also assert that plaintiff repeatedly failed to estab-

lish a foundation for Caskey's opinions. For example, the Cubs assert that plaintiff never established that the documents and data upon which Caskey relied were of a type reasonably relied upon by experts. The Cubs further assert that plaintiff's direct examination provided no factual basis for Caskey's opinion that the area behind home plate would be considered the most dangerous area of the ballpark.

Expert testimony is admissible if it assists the trier of fact in understanding the evidence or deciding a fact in issue and the witness is qualified by reason of knowledge, skill, experience, education or training to give said testimony. (*Ruffiner v. Material Service Corp.* (1985), 134 Ill. App. 3d 747, 755, 480 N.E.2d 1157, 1162, *rev'd on other grounds* (1987), 116 Ill. 2d 53, 506 N.E.2d 581.) The question of whether a witness is sufficiently qualified as an expert rests within the sound discretion of the trial court. *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257, 264.

■ In this case, the record indicates that Caskey was called as a safety consultant. The record further indicates that Caskey had been involved with the planning, design and development of approximately 300 softball and baseball fields of various sizes. The Cubs note that cross-examination established that Caskey had never designed a major league stadium or its screen and that Caskey conceded the design considerations at the major league level would be different from the level at which Caskey had worked. Although this court may occasionally determine that a witness testified beyond the scope of his or her expertise (*Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 438 N.E.2d 1217), the record here indicates that Caskey had acted as a consultant for the Chicago White Sox in a similar lawsuit. The record also indicates that the Cubs' expert, Richard de Flon, testified that one need not have designed a major league stadium to render an opinion on backstops. The record further shows that the parties cross-examined the opposing experts, giving the jury ample opportunity to assess their credibility. (*Ruffiner*, 134 Ill. App. 3d at 755, 480 N.E.2d at 1162.) Based on this record, the trial court could determine that Caskey was qualified to testify as an expert in this case.

Defendant next contends that plaintiff failed to establish the foundational requirement that the documents and data Caskey relied upon were of a type reasonably relied upon by experts in the field. In this regard, it is important to note that defendant's argument is that the entire deposition should have been excluded for foundational reasons; defendant raised specific objections to specific opinions at trial, but relies upon the broader challenge on appeal. Where the issue is the

exclusion or admission of an expert's entire testimony, the trial court should liberally allow the expert to determine the materials upon which experts in his or her field may rely in rendering an opinion. (*Lovelace v. Four Lakes Development Co.* (1988), 170 Ill. App. 3d 378, 383, 523 N.E.2d 1335, 1339.) It is then the opposing party's responsibility to challenge the basis of the expert's opinion, with the weight of the opinion ultimately left to the trier of fact. (See *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 216-17, 503 N.E.2d 355, 358.) Where an expert testifies that his or her opinions are based on a reasonable degree of expert certainty within a given field, a jury may infer that the data upon which the expert relied were of a type reasonably relied upon by such an expert. See *Melecosky*, 115 Ill. 2d at 216, 503 N.E.2d at 358.

■ In this case, the record indicates that Caskey testified that his opinions were based upon a reasonable degree of certainty within the area of baseball stadium design, construction and operation. The record also shows that the Cubs subjected Caskey's qualifications and opinions to extensive cross-examination. Indeed, on cross-examination the Cubs established that Caskey also based his opinions on years of reading publications and documentation regarding the design, operation and safety of baseball fields and stadiums, though he could not recall if any specifically addressed major league stadiums. The record further indicates that Caskey testified that his definition of the area behind home plate was based on his education, training and experience. The record indicates that Caskey stated that he did not make time-distance measurements in this case, and could not recall if any studies conducted by major league baseball established that the area behind home plate is the most dangerous area of the ballpark. However, the jury may have been able to reasonably make that inference based upon Caskey's years of experience and his reading of documents apparently not prepared by major league baseball. Indeed, we note that numerous courts have recognized the area behind home plate as the most dangerous area of the ballpark. (See *Coronel*, 230 Ill. App. 3d at 737 (and cases cited therein).) Given this record, the trial court did not err in admitting the entirety of the testimony over the foundational objection.

## B

Defendant's second evidentiary objection concerns the admission of evidence of other foul ball injuries. Defendant contends that the trial court erred in allowing plaintiff to impeach Rathje with the discovery interrogatory indicating 62 foul ball incidents occurred in the

"area behind home plate" (as defined by Caskey) during the 1982 baseball season, because there was no foundation establishing that the incidents were similar. The record shows that Rathje testified on rehabilitation that there were 62 foul ball incidents at Wrigley Field during the 1982 season, but only 10 occurred in the area behind home plate. Defendant also contends that the error was compounded because during defendant's rehabilitation questions on this point, the trial court precluded defendant from establishing that Rathje had noted and explained the error in a 1984 deposition.

Evidence of prior similar occurrences may be admissible for any number of purposes; the determination of whether occurrences are sufficiently similar to the one at issue rests within the sound discretion of the trial court. (*Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 1065, 502 N.E.2d 315, 326.) The other incidents need only be substantially similar; they need not be identical. (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538.) At some point, the similarity of circumstances will go only to the weight of the evidence, rather than its admissibility. *Yassin*, 150 Ill. App. 3d at 1065, 502 N.E.2d at 326.

■ Regarding the 1982 incidents, defendant wonders whether all of them involved spectators who were sitting quietly or whether some injuries may have resulted because the spectator was attempting to pursue the foul ball. Defendant also wonders whether the 1982 incidents all involved game balls as opposed to practice balls. The record indicates that the interrogatory at issue was designed to determine the number of persons hit by foul balls in a particular area of the stands. Such evidence could be relevant to show the feasibility of the safety measures sought by plaintiff. (*Yassin*, 150 Ill. App. 3d at 1065, 502 N.E.2d at 325.) Defendant offers no evidence or argument to suggest that the differences hypothesized would significantly affect a determination of the feasibility of a larger screen.

Turning to defendant's assertion that it was prejudiced by the exclusion of Rathje's prior consistent statement, the record indicates that Rathje was permitted to explain the error in his previous interrogatory. Even if the prior consistent statement was admissible, reversal is not warranted because the exclusion did not materially affect the result. See, *e.g.*, *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.

## C

Defendant's third and final evidentiary objection is that the trial court erred in precluding defendant from presenting evidence of plain-

tiff's alleged contractual assumption of the risk. Defendant based this defense on a disclaimer of liability printed on the back of plaintiff's ticket.

■ An express agreement to assume a risk will not be effective unless it appears that the plaintiff has given his or her assent to the terms of the agreement. (See Restatement (Second) of Torts §496B, Comment *c* (1977); see also *Larsen v. Vic Tanny International* (1984), 130 Ill. App. 3d 574, 577, 474 N.E.2d 729, 732 (citing section 496B, Comment *d*).) In this case, the trial court ruled that the disclaimer on the back of plaintiff's ticket could not form the basis of defense because the print was so small that it was not legibly reproduced on the photocopy submitted to the trial court. Plaintiff's acceptance of a ticket containing a disclaimer in fine print on the back is not binding for the purposes of asserting express assumption of the risk. (Restatement (Second) of Torts §496B, Comment *c*, Illustration 1 (1977).) The cases relied upon by defendant involve signed agreements and are distinguishable on that basis. Consequently, the trial court did not err in barring the defense.

### III

Finally, the Cubs argue that the trial court erred in giving certain jury instructions, resulting in an unfair trial. Jury instructions are deemed adequate if they are sufficiently clear to avoid misleading the jury and fairly and correctly state the law. (*Villa*, 202 Ill. App. 3d at 1087-88, 560 N.E.2d at 972.) An instruction will be deemed properly given if it is supported by some evidence in the record; whether an issue is raised by the evidence and which instruction may be given thereon is within the discretion of the trial court. See *Villa*, 202 Ill. App. 3d at 1087-88, 560 N.E.2d at 972.

Defendant first contests the instruction which set forth the theories of liability pursued by plaintiff. Defendant's brief attacks the instruction solely on the ground that "there is no basis in law for the imposition of a duty to warn" in this case; we have limited our review of the instruction accordingly.

■ In most jurisdictions, a ballpark owner-occupier owes no duty to warn of the risk of being hit by a batted ball while attending a baseball game due to the obvious nature of the risk. (See *Falkner v. John E. Fetzer, Inc.* (1982), 113 Mich. App. 500, 502-03, 317 N.W.2d 337, 339 (nevertheless recognizing a duty to warn).) In this jurisdiction, a ballpark owner is not always absolved of liability once he or she provides adequate screening. (*Maytnier*, 80 Ill. App.

2d at 343, 225 N.E.2d at 87.) Indeed, *Coronel* rejects the sort of *per se* rule of nonliability urged upon us by defendant, stating:

> " 'The inquiry is whether the defendant should reasonably anticipate injury to those entrants on his premises who are generally exercising reasonable care for their own safety, but who may reasonably be expected to be distracted \* \* \* or forgetful of the condition after having momentarily encountered it. *If in fact the entrant was also guilty of negligence contributing to his injury, then that is a proper consideration under comparative negligence principles.*' (Emphasis added.)" (*Coronel*, 230 Ill. App. 3d at 741, quoting *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 152, 554 N.E.2d 223, 232.)

Here, the record indicated that plaintiff was engaged in a discussion about the game with his sister, which could be construed as momentary distraction or forgetfulness. The trial court may have determined, in its discretion, that this evidence warranted an instruction on plaintiff's duty to warn theory.

Defendant next contends that the trial court erroneously refused to instruct the jury that plaintiff was required to prove that the Cubs knew or should have known of the hazard which injured plaintiff. Defendant notes that such an instruction would conform with section 343 of the Restatement (Second) of Torts (1977), which is the law in Illinois. See *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465.

■ The Cubs zealously maintained throughout this litigation that the hazard in this case was open and obvious. The suggestion that the Cubs may have been unaware of this hazard is somewhat ironic.

Even if it somehow were error to exclude a notice instruction, a reviewing court generally will not reverse on that basis unless the the error clearly misled the jury and resulted in prejudice to the appellant. (*Villa*, 202 Ill. App. 3d at 1088, 560 N.E.2d at 973.) In this case, Cubs employee Rathje testified that in the 1982 season, there were 62 foul ball incidents, 10 of which occurred in the "area behind home plate," despite the presence of a screen in that area. Moreover, Rathje testified that the purpose of the screen was to protect spectators in the "area directly behind home plate." Thus, there appears to be no doubt that the Cubs were aware that some risk was involved. Furthermore, after undertaking the task of protecting spectators in "the most dangerous area of the ballpark," the Cubs were obliged to exercise reasonable care in that undertaking. (See Restatement (Second) of Torts §323 (1977).) Accordingly,

the Cubs have failed to demonstrate that the jury was misled or that the Cubs were prejudiced by this omission.

Moreover, defendant's invocation of *Genaust* is unpersuasive. *Genaust* involved an injury caused by power lines that were neither on the defendant's property nor within the defendant's control and there was nothing to suggest that plaintiff would be momentarily distracted. *Genaust* is therefore distinguishable from this case, in which the hazard is incident to the activity engaged in upon property owned or occupied by defendant and evidence of distraction appears in the record. See *Ward*, 136 Ill. 2d at 155-56, 554 N.E.2d at 234.

■ Finally, the Cubs contend that the trial court erroneously gave an instruction allowing plaintiff to recover for future pain and suffering. The Cubs assert that there was no competent medical testimony that the headaches plaintiff suffered were likely to continue into the future. However, plaintiff's testimony that his headaches were recurring at the time of trial was sufficient to support the instruction. *Warp v. Whitmore* (1970), 123 Ill. App. 2d 157, 163, 260 N.E.2d 45, 48; *Simpson v. Marks* (1953), 349 Ill. App. 527, 532, 111 N.E.2d 370, 373; see *Onion v. Chicago & Illinois Midland Ry. Co.* (1989), 191 Ill. App. 3d 318, 322, 547 N.E.2d 721, 724. But see *Young v. Hummel* (1991), 216 Ill. App. 3d 303, 309, 576 N.E.2d 1072, 1076 (suggesting in *dicta* that lay testimony alone is insufficient).

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed as modified.

O'CONNOR and MANNING, JJ., concur.